IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

MICHAEL ELIAS RUDA,            )
                               )
          Plaintiff,           )
                               )
     v.                        )     CASE NO. 3:19-CV-232-WKW
                               )              [WO]
TOBIS BOISVERT, *et al.*,       )
                               )
          Defendants.          )

## MEMORANDUM OPINION AND ORDER

Shortly after midnight on March 30, 2018, Plaintiff Michael Elias Ruda was arrested in the parking lot of the Glory Days bar on multiple charges, including driving under the influence. Mr. Ruda alleges that three Phenix City police officers—Tobias Boisvert, Michael Bettencourt, and Joshua Geiger—unlawfully arrested him without probable cause and used excessive force to effectuate his unlawful arrest. He sues the officers in their individual capacities for violating his rights under the Fourth Amendment, as enforced by 42 U.S.C. § 1983, and his rights under Alabama law. Before the court are the parties' cross-motions for summary judgment. Mr. Ruda moves for partial summary judgment on the issue of liability on the § 1983 claims (Doc. # 54), and Defendants move for summary judgment, arguing they are entitled to qualified immunity on the § 1983 claims and State-agent immunity on the state law claims (Doc. # 58).

After careful consideration, the court finds that genuine disputes of material fact preclude the entry of summary judgment for either side on the § 1983 Fourth Amendment claims for unlawful arrest and excessive force against Officer Boisvert and on the § 1983 Fourth Amendment claims against Officers Bettencourt and Geiger for excessive force.  The court further finds that Officers Bettencourt and Geiger are entitled to qualified immunity on the § 1983 Fourth Amendment unlawful arrest claim and that all Defendants are entitled to State-agent immunity on the state law claims.

## I.  JURISDICTION AND VENUE

Because this action arises under 42 U.S.C. § 1983, the court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  As to the claims arising under state law, the court exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Ellison v. Hobbs*, 334 F. Supp. 3d 1328, 1338 (N.D. Ga. 2018), *aff'd*, 786 F. App'x 861 (11th Cir. 2019). "[C]ross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal citation, alteration, and quotations omitted).

Finally, although the facts and reasonable inferences are drawn in the non-movant's favor, the Supreme Court has instructed the lower courts that, "when there is a reliable video recording of disputed events," the facts should be viewed "'in the light depicted by the video[].'" *Davidson v. City of Opelika*, 675 F. App'x 955, 957 (11th Cir. 2017) (alterations added) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

## III. BACKGROUND

The facts are drawn from the evidence submitted by the parties, including Mr. Ruda's affidavit, each officer's deposition testimony, the dashcam videos, and the limited stipulations. Because disputed material facts abound in this cross-motion

context, it is unnecessary to set out separately two versions of the parties' respective accounts.  These are the facts for purposes of summary judgment.  At the trial, these facts may change, go away, or be added to or amplified.

It was half-past midnight on March 30, 2018, in Phenix City, Alabama; the streets were soaked with precipitation, and it was drizzling rain.  Officer Boisvert, a patrol officer with the Phenix City Police Department, was in the middle of his twelve-hour shift.  (Doc. # 63-6, at 111 (Boisvert Dep.).)  He had stopped for a cup of coffee at the Circle K, which sits at the intersection of Highway 80 West and Auburn Road in Phenix City, Alabama (Doc. # 63-6, at 66, 95, 111), when the police department's dispatch reported:  "80 West near Auburn Heights Church, reference to a possible intoxicated driver.  Car involved, duty CPD officer, uh, is a white pickup truck was swerving in and outta lanes, pulled up behind the church."  (Doc. # 63-6, at 47 (Boisvert's Dep.)); (Doc. # 55-20 (Dispatch Transcript).)  Moments later, Officer Boisvert, who was in close proximity to the location of the call, observed a white pickup truck approaching from the direction the dispatcher had announced.  (Doc. # 63-6, at 95, 117.)  The pickup truck "stopped short of the stop light . . . in the middle of the road essentially."  (Doc. # 63-6, at 95–96.)  This maneuver caused Officer Boisvert to believe that the driver, who later turned out to be Mr. Ruda, was under the influence of alcohol and that this was the truck described by the dispatcher.  (Doc. # 63-6, at 62.)  Officer Boisvert got back into his patrol car

to follow the truck and watched it "inching forward toward the light."  (Doc. # 63-6, at 96.)

Officer Boisvert's patrol car is equipped with a dashcam video camera.  The dashcam video recording begins as Officer Boisvert is driving out of the Circle K parking lot south on Auburn Road.[1]  The following recounts what the dashcam video depicts, supplemented by Officer Boisvert's testimony as to events he contends the dashcam video does not depict either due to the timing, its angle, or the nighttime, rainy conditions.[2]

Officer Boisvert testified that, when the light turned green at the intersection of Auburn Road and Highway 80, the pickup truck "ma[d]e a left turn" onto Highway 80 and "beg[a]n fishtailing nearly striking a vehicle that was in front of the suspect vehicle."  (Doc. # 63-6, at 120, 123–24.)  However, Officer Boisvert testified that, because of his patrol car's position in relation to the truck's, the

---

[1] Officer Boisvert testified that the dashcam video on his patrol car automatically starts recording when he turns on the blue lights, and rewinds to include the thirty seconds preceding the activation of the lights.  Hence, the dashcam recording begins thirty seconds prior to Officer Boisvert's turning on the blue lights.  (Doc. # 63-6, at 83.)  The dashcam displays the date and continuously display the time.  (Doc. # 63-6, at 86, 97.)

[2] Mr. Ruda argues repeatedly that the dashcam video taken from Officer Boisvert's patrol car is the best evidence of what transpired on March 30, 2018, and that Officer Boisvert's testimony about events that are not visible on the video cannot create a genuine dispute of material fact.  (*See, e.g.*, Doc. # 57, at 10–15.)  As discussed in Part IV.A., given the dashcam's lack of clarity at times, Officer Boisvert's version of events, while providing fodder for cross examination, does not present grounds for its exclusion.  *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that the plaintiff's version of the facts should not have been adopted for purposes of ruling on a summary judgment motion because it was "blatantly contradicted" by a video).

dashcam did not capture the pickup truck as it made the left turn. (Doc. # 63-6, at 121.) By the time that Officer Boisvert turned left onto Highway 80, the white pickup truck had gained distance and was 1,000 feet ahead of him. (Doc. # 63-6, at 129.)

On his police radio, Officer Boisvert reports that he has the white pickup truck in sight and that he is travelling east on Highway 80. After he turns on his blue lights (but not his siren), Officer Boisvert says over the radio: "Don't look like it's gonna stop, looks like it's gonna try to take off from me. [The truck is] [t]akin' a right onto 280. Traffic light. Roads are obviously wet. Can't get close enough to get the tag. I keep fishtailin'." (Doc. # 55-20.) Officer Boisvert testified also that he observed the pickup truck, which was traveling "extremely fast," hit a curb on the right side of the road but that the dashcam video recording is "too fuzzy" to capture it. (Doc. # 63-6, at 124–25.) Officer Boisvert testified that the pickup truck then came to a stop at the traffic light on Highway 280 "after nearly striking several vehicles," but he admits that the pickup truck's movement is "not visible" on the dashcam. (Doc. # 63-6, at 147, 162.) While Mr. Ruda was stopped at this traffic light, Officer Boisvert was directly behind Mr. Ruda's truck, and he says that, looking through the back rear window of the truck, he saw Mr. Ruda's head, shoulders, and upper arms moving, indicating to him that Mr. Ruda was reaching for something in his console.

Officer Boisvert admitted that he could not see Mr. Ruda's hands.  (Doc. # 63-6, at 168–73.)

At this point, Officer Boisvert activates his siren to accompany the blue lights as he is turning right onto Highway 280 in an attempt to conduct a traffic stop of the pickup truck.  (*See* Doc. # 55-1, at 1 (Diagram).)  Officer Boisvert still is pursuing the truck, which is traveling in the right lane of the four-lane highway, when he observes it "swerve[] over into the left lane," but he admits that this is "difficult" to see on the dashcam video "with all the rain," but that the "tire marks" are visible. (Doc. # 63-6, at 64–65.)  He follows the truck, which turns into the Glory Days bar's gravel parking lot.  (Doc. # 55-20); *see also* Doc. # 63-6, at 47–50).)  Officer Boisvert testified that, after the pickup truck pulled into the Glory Days parking lot, it abruptly stopped and "almost ran into the building."  (Doc. # 63-6, at 190–91.)

Officers Bettencourt and Geiger did not participate in this pursuit of Mr. Ruda. Officer Bettencourt had been listening to the police radio and turned around when he passed Officer Boisvert, who was traveling in the opposite direction with his blue lights activated.  (Doc. # 63-2, at 47, 48, 55 (Bettencourt Dep.); Bettencourt Dashcam Video (Doc. # 59-11).)  Officer Bettencourt and Officer Geiger first saw the white pickup truck as it was making a right turn off Highway 280, which was just prior to the truck pulling into Glory Days.  (Doc. # 63-2 at 52; Doc. # 63-3, at 37 (Geiger Dep.).)  By the time Officers Bettencourt and Geiger exited their patrol

cars at Glory Days, Officer Boisvert was walking toward Mr. Ruda, with his firearm drawn and pointed at Mr. Ruda, who had stepped out of his truck.  (Doc. # 63-3, at 33 ("[B]y the time I exited my vehicle, Corporal Boisvert was already up and approaching the driver with his weapon out."); *see also* Doc. # 63-3, at 35, 36, 38–39; Doc. # 63-2, at 50.)  Officer Geiger did not know why Officer Boisvert had drawn his firearm; however, he, like Officer Bettencourt, was privy to the dispatch communications and knew that Officer Boisvert had located the white pickup, reported by a Columbus, Georgia police officer.  (Doc. # 55-20; Doc. # 63-3, at 32, 36, 40-44.)

Officer Boisvert's pursuit of Mr. Ruda into the Glory Days parking lot lasted approximately ninety seconds and covered three-quarters of a mile, during which Officer Boisvert says that he maintained constant visual contact with Mr. Ruda's truck.  (Doc. # 63-6, at 52, 59–60, 104, 117–18.)  Concerning the quality of the dashcam video for these first ninety seconds, waterdrops and streaks of water are visible on the windshield of Officer Boisvert's patrol car.  There is a glare on the video created by the combination of the accumulated water on the windshield,[3] the flashing blue lights, the headlights from oncoming vehicles, and the street lighting.

---

[3] The patrol car's windshield wipers are activated only once when Officer Boisvert first started tracking Mr. Ruda's truck.

Back to the scene, Officer Boisvert pulls into the Glory Days parking lot and stops his patrol car so that it is angled to the rear and left of the white pickup truck. Officer Boisvert is captured on the dashcam just after he steps out of his patrol vehicle. He immediately draws his weapon, and quickly walks six to seven steps to reach the driver's door. The camera does not capture Mr. Ruda, who is blocked from view by Officer Boisvert's back. During his approach to the truck, Officer Boisvert is yelling at Mr. Ruda. Officer Boisvert's lights and siren are blinking and blaring, as are those of at least one of the other police cars on the scene. The initial commands are inaudible on the recording, but then Officer Boisvert, who is wearing a microphone, is heard yelling multiple times for Mr. Ruda to "[g]et on the ground" and show his hands. (Boisvert Dashcam Video, 12:28:39 to 12:29:53.)

When Officer Boisvert reaches the open door of the white pickup truck, the camera shows Mr. Ruda stepping out of the truck, with his hands raised and palms open. Officer Boisvert holsters his firearm on his right hip. Officer Boisvert is still shouting at Mr. Ruda. While much of it is inaudible or jumbled, one command, "Put your hands in the air," is clear on the audio. With his hands still raised, Mr. Ruda turns toward the truck and appears to place both hands, palms open, on the edge of the toolbox, which is mounted in the bed of the truck. Officer Boisvert forcefully grabs Mr. Ruda's arm, pushes Mr. Ruda away from the truck, and yells "get the f--- on the ground." (Boisvert Dashcam Video, 12:28:50–51.) When Officer Boisvert

grabbed Mr. Ruda's arm, he smelled the "odor of alcoholic beverage."  (Doc. # 63-6, at 251–52.)  At this juncture, Officer Boisvert deemed Mr. Ruda to be under arrest for DUI.  (Doc. # 63-6, at 252–53.)  Officer Boisvert and Mr. Ruda begin to struggle; both lunge forward for several steps as Officer Boisvert is trying to push him to the ground.

During this initial struggle between Mr. Ruda and Officer Boisvert, Officers Bettencourt and Geiger appear on the dashcam video, one running toward Officer Boisvert from the left and the other from the right.  In the initial seconds after Officer Boisvert grabs Mr. Ruda's arm and is trying to force him to the ground, Officers Bettencourt and Geiger join in.  All three officers, while standing and surrounding Mr. Ruda, are trying to physically force Mr. Ruda to the ground.  The dashcam video shows the officers grabbing Mr. Ruda's head, kicking, and kneeing him continually for six seconds until Mr. Ruda falls face forward toward the gravel ground and attempts to break the fall with his hands.  The officers end up on top of him.

The ensuing scrum will not be set out here blow by blow.  It is difficult to make out every movement because the three officers are crouched over and on top of Mr. Ruda, who appears to be trying to turn over on his back.  Suffice it to note, during the next fifty-four seconds, the officers, collectively, delivered no less than nine blows, some in rapid succession, to Mr. Ruda in his back and head area.  Whenever Mr. Ruda tried to lift or turn his face from the ground, an officer forced

Mr. Ruda's head back into the gravel, with either a blow by the knee or by the hand or by forcefully holding his head to the ground with a hand.[4]  Between the officers' blows, Officer Bettencourt pulls a taser from a holster on his right side and applies it to Mr. Ruda's back area twice, for a total of seventeen seconds, and presses his knee on the back of Mr. Ruda's head.[5]  (Boisvert Dashcam Video, 12:29:11–12:29:28); (Doc. # 55-45, at 6 (Supplemental Incident Report).)  Finally, Ruda is handcuffed, and the officers stand up and step away.  Mr. Ruda then is able to turn over and sit up with his hands cuffed behind his back.  Mr. Ruda was not armed, and the officers did not pat him down for weapons at that time.  (Boisvert Dep., at 263; Dashcam Video, 12:29:50.)

A total of seventy-two seconds elapsed from the moment Mr. Ruda opened his truck door, after pulling into the parking lot at Glory Days, until he was handcuffed on the ground.  During this time, the officers did not ask Mr. Ruda any

---

[4] Officer Boisvert admits that the officers kept striking Mr. Ruda with their fists and hands after he was face down on the ground, but he says that Mr. Ruda was trying to pull his hands around to his front, and the officers were trying to handcuff his hands behind his back.  (Doc. # 63-6, at 286–87.)

[5] Officer Bettencourt testified that he applied the taser to Mr. Ruda in the drive-stun mode.  (Doc. # 63-2, at 289–90.)  When a taser is used in the "'drive stun mode,' the prongs are not used; instead, the taser is pressed directly against a person's skin." *Cantu v. City of Dothan, Alabama*, No. 18-15071, 2020 WL 5270645, at *4 (11th Cir. Sept. 3, 2020) (citation omitted).  "That mode can be used in an attempt to obtain compliance by causing pain, but it generally does not incapacitate a person as the prong mode is designed to do. Drive stun mode tasing does not cause serious physical injury." *Id.* (citations omitted).  (*See also* Doc. # 63-6, at 329.)

questions, and the sirens from two of the patrol cars blared continuously with the blue lights flashing.

Mr. Ruda offers his perspective as to what occurred during these seventy-two seconds in the Glory Days parking lot. (Doc. # 55-19 (Pl.'s Aff.).) His account is more in the nature of an explanation for his actions. He says that he first noticed Officer Boisvert's patrol car when it stopped directly behind him at the traffic light at the intersection of Highway 280 and Thirteenth Street. Mr. Ruda heard the siren and, from his rear view mirror, saw the blue lights. Mr. Ruda says that, while he was not certain that the patrol car was signaling him, he looked for the first opportunity to pull over, which was the Glory Days parking lot. When he started to get out of his truck, he could see an officer pointing a firearm at him from about twenty- or twenty-five feet away. However, he could not hear what the officer was saying because multiple police cars had arrived, and the sirens were blaring. Because he was not asked any questions—or asked to provide his driver's license— he was confused why three officers were trying to push him down onto the rocky gravel of the parking lot. He further attests that he "did nothing during the whole of this event to resist" and that he "never struck or attempted to strike or injure" the officers. (Doc. # 55-19, at 2.) Rather, his "movements and actions were all taken in an attempt to ward off their blows and assaults and minimize [his] injuries." (Doc. # 55-19, at 2.)

Officer Bettencourt transported Mr. Ruda to the hospital for treatment for his injuries. (Doc. # 63-2, at 84–85; Doc. # 55-45, at 6.) Those injuries included a broken elbow, contusions, and abrasions to Mr. Ruda's face, chest, and stomach. (Doc. # 55-19, at 2; Doc. # 55-17 (medical records); Doc. # 63-2, at 84–85).) After Mr. Ruda was treated and released, Officer Bettencourt booked Mr. Ruda in the Russell County Jail on charges for DUI,[6] attempting to elude a law enforcement officer, resisting arrest, and criminal mischief in the third degree.[7] (Doc. # 55-45, at 6.) At a non-jury trial in the City of Phenix City Municipal Court, Mr. Ruda was found not-guilty on the charges of DUI, attempting to elude, and criminal mischief, but he was convicted on the charge of resisting arrest. (Doc. # 91 (Stipulated Facts); Doc. # 63-6, at 364–65, 371–73.)

Seeking to hold Defendants accountable for his injuries, Mr. Ruda brought this action in April 2019. In the operative amended complaint (Doc. # 50), Mr. Ruda alleges that Officers Boisvert, Bettencourt, and Geiger violated his Fourth Amendment rights by arresting him without probable cause and by using excessive force against him. He brings his claims against the officers in their individual capacities under § 1983. Mr. Ruda also brings state law claims under Alabama law

---

[6] The Alabama Uniform Traffic Ticket charges Mr. Ruda with driving "[u]nder the Influence of any Substance which impairs the Mental or Physical Facilities." (Doc. # 55-46); *see* Alabama Code § 32-5A-191(5).

[7] The criminal mischief charge was brought because Officer Boisvert's Apple watch was broken during the scrum. (Doc. # 55-45, at 4.)

for false imprisonment, false arrest, unlawful restraint of freedom, assault and battery, and malicious prosecution.   The parties filed cross motions for summary judgment to which the discussion turns.

## IV.  DISCUSSION

### A.    § 1983 Fourth Amendment Claims and Qualified Immunity

#### 1.    *Qualified Immunity:  Generally*

Defendants move for summary judgment on the § 1983 Fourth Amendment claims, arguing they are entitled to qualified immunity.   Qualified immunity completely "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).   A Government official raising a qualified immunity defense "bears the initial burden of showing 'he was acting within his discretionary authority.'"   *Glasscox v. Argo, City of*, 903 F.3d 1207, 1213 (11th Cir. 2018) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007)).   If the official satisfies this showing—which is undisputed here (*see* Doc. # 91 (Stipulated Facts)—"the burden shifts to the plaintiff to show that '(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the

alleged violation.'" *Glasscox*, 903 F.3d at 1213 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).

> **2.** ***Fourth Amendment Law on Traffic Stops and Arrests: Reasonable Suspicion and Probable Cause***

Mr. Ruda's § 1983 unlawful arrest claim arises from a traffic stop. Officer Boisvert says he stopped Mr. Ruda and had probable cause to arrest him for driving under the influence ("DUI"), in violation of Alabama law. Defendants contend that they are entitled to qualified immunity because there was probable cause or, at least, arguable probable cause to arrest Mr. Ruda for DUI.[8] (Doc. # 61, at 24.) Mr. Ruda contends that he is entitled to summary judgment on the issue of liability based on Officer Boisvert's dashcam video, which he says conclusively establishes that there was no probable cause, actual or arguable, for his arrest.

---

[8] Mr. Ruda faced multiple charges, but the summary judgment arguments focus on the DUI charge; thus, the court does the same. Alabama Code § 32-5A-191 defines DUI as follows:

> (a) A person shall not drive or be in actual physical control of any vehicle while:
> (1) There is 0.08 percent or more by weight of alcohol in his or her blood;
> (2) Under the influence of alcohol;
> (3) Under the influence of a controlled substance to a degree which renders him or her incapable of safely driving;
> (4) Under the combined influence of alcohol and a controlled substance to a degree which renders him or her incapable of safely driving; or
> (5) Under the influence of any substance which impairs the mental or physical faculties of such person to a degree which renders him or her incapable of safely driving.

Ala. Code § 32-5A-191.

Genuine disputes of material fact preclude summary judgment for Officer Boisvert on his qualified immunity defense and for Mr. Ruda on liability. Because the arrest occurred nearly simultaneously with the stop, whether Officer Boisvert had reasonable suspicion (actual or arguable) to conduct the traffic stop and whether Officer Boisvert thereafter developed probable cause (actual or arguable) to arrest Mr. Ruda are inextricably intertwined; hence, both the initial stop and arrest are addressed. As to Officers Bettencourt and Geiger, they are entitled to qualified immunity on the Fourth Amendment unlawful arrest claim.

The Fourth Amendment protects people from "unreasonable searches and seizures" by government officials. "Its protections extend to brief investigatory stops of persons or vehicles . . . ." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "Under the Fourth Amendment, a police officer generally may lawfully detain an individual without a warrant if (1) there is probable cause to believe that a traffic violation has occurred (a traffic stop), or (2) there is reasonable suspicion to believe the individual has engaged or is about to engage in criminal activity (an investigative or Terry stop)." *United States v. Gibbs*, 917 F.3d 1289, 1294 (11th Cir. 2019) (citing *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008)). "While there are obvious differences between a traffic stop and a Terry stop, the Supreme Court has recognized that the two are 'analogous' both in their 'duration and atmosphere.'" *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 n.29 (1984)). The *Gibbs* court

explained: "In evaluating both traffic and Terry stops, we examine (1) whether the officer's action was justified at its inception—that is, whether the officer had probable cause or reasonable suspicion to initiate the stop, and (2) whether the stop was reasonably related in scope to the circumstances that justified it in the first place." *Id.*

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* But "when an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Id.* at 1166.

"For probable cause to arrest to exist, an arrest must be objectively reasonable based on the totality of the circumstances. This standard is met when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Alston v. Swarbrick*, 954 F.3d 1312, 1318 (11th Cir. 2020) (citations omitted). Even where an officer lacks probable cause for a traffic stop, he is entitled

to qualified immunity if he had arguable probable cause to make an arrest. *Id.* "Arguable probable cause exists if reasonable officers in the same circumstances and possessing the same knowledge as the defendants could have believed that probable cause existed to arrest the plaintiff." *Id.* (cleaned up).

### a.   Officer Boisvert

Officer Boisvert's arguments focus on probable cause for the arrest for DUI. Officer Boisvert argues that there was probable cause, or at least arguable probable cause, to arrest Mr. Ruda for DUI based upon the information relayed by the dispatcher, his observations of Mr. Ruda's erratic driving prior to the traffic stop, and the smell of alcohol on Mr. Ruda's breath.  (Doc. # 61, at 32.)  Disagreeing, Mr. Ruda contends that arguable probable cause does not support the arrest.  First, he argues that the officer's "tip" of a "possibly intoxicated" suspect driving a white pickup truck is "insubstantial" based upon the legion of white pickup trucks in the Phenix City area.  (Doc. # 65, at 13.)  Second, Mr. Ruda contends that the best evidence of Mr. Ruda's driving is Officer Boisvert's dashcam video, which does not substantiate Officer Boisvert's testimony of his allegedly erratic driving.  Third, because Mr. Ruda pinpoints the arrest as occurring when Officer Boisvert drew his weapon on Mr. Ruda in Glory Days parking lot, he argues that Officer Boisvert's alleged smell of alcohol cannot factor into the probable cause analysis but that, even

if it could, that fact is conspicuously absent in Officer Boisvert's incident report made contemporaneously with the arrest. (Doc. # 65, at 13–14.)

The parties agree that Mr. Ruda was seized for Fourth Amendment purposes when Officer Boisvert exited his vehicle with his firearm drawn and yelled for Mr. Ruda, who had exited his truck, to get on the ground. *See United States v. Street,* 472 F.3d 1298, 1310 (11th Cir. 2006) ("[A] person is seized when a reasonable person would [not] feel free to terminate the encounter with the police.") (internal quotation marks omitted). This initial seizure was lawful if there was reasonable suspicion to believe that Mr. Ruda was driving under the influence of alcohol, and Officer Boisvert is entitled to qualified immunity if that reasonable suspicion is only arguable. Against this backdrop, summary judgment is not appropriate for either Mr. Ruda or Officer Boisvert because whether arguable or actual reasonable suspicion existed for this seizure depends upon which version of events a jury believes. In other words, Mr. Ruda's and Officer Boisvert's versions conflict at all material points.

If the jury credits Officer Boisvert's version of events preceding the stop, then the facts go something like this. Shortly after the dispatcher reported that an off-duty police officer had observed a white pickup truck "swerving in and outta lanes" in an area near his location at the Circle K, Officer Boisvert saw a white pickup truck traveling from that same direction. (Doc. # 63-6, at 62.) The truck "stopped short"

of the "stop bar," not "anywhere near the stop light" (Doc. # 63-6, at 95–96), which Officer Boisvert described as erratic driving. Officer Boisvert began following Mr. Ruda. While trailing Mr. Ruda, Officer Boisvert observed the white pickup truck (1) "swerve[]" and fail "to maintain [its] lane" (Doc. # 63-6, at 62), (2) take a left turn onto Highway 80 and fishtail, nearly striking the vehicle in front of it (Doc. # 63-6, at 120, 123–24), (3) hit a curb while traveling "extremely fast" (Doc. # 63-6, at 124–25), (4) stop at a traffic light on Highway 280 "after nearly striking several vehicles" (Doc. # 63-6, at 147, 162), and (5) "almost r[un] into" the Glory Days building when parking (Doc. # 63-6, at 190–91). This information, if credited, supplies reasonable suspicion or at least arguable reasonable suspicion to stop Mr. Ruda for DUI. *See Jenkins v. Gaither*, 543 F. App'x 894, 897 (11th Cir. 2013) (officer had reasonable suspicion to stop a driver for DUI based on a dispatch "that [the driver] was driving at an unusual speed and weaving across the road" and where the off-duty officer who reported "the erratic driving identified Jenkins's vehicle"); *United States v. Johnson*, 136 F. App'x 279, 282 (11th Cir. 2005) (holding that whether the officer's determination that the driver violated the lane-swerving statute was erroneous was inconsequential because the officer's concern that the driver was sleeping or intoxicated was "sufficient justification to stop a motorist").

Mr. Ruda does not argue that Officer Boisvert's observations about his driving, if believed, would not justify the initial stop based on a reasonable suspicion

of DUI.   Rather, Mr. Ruda argues that the dashcam video proves that Officer Boisvert is lying because most, if not all, of Officer Boisvert's reported observations about Mr. Ruda's erratic driving are not visible on Officer Boisvert's dashcam video. Hence, Mr. Ruda contends that Officer Boisvert's testimony must be rejected.

No doubt, Officer Boisvert's dashcam video is critical evidence.  *See Cantu v. City of Dothan, Ala.*, No. 18-15071, 2020 WL 5270645, at *6 (11th Cir. Sept. 3, 2020) (observing that the dashcam video "is the most important piece of evidence in the case not only because of its unquestioned objectivity but also because the critical events happened quickly, and with a video recording, it is possible to freeze frame the images of them").   Notwithstanding that many of Officer Boisvert's reported observations about Mr. Ruda's allegedly erratic driving are not depicted on the dashcam video, the video does not solidify the facts as undisputed.   Officer Boisvert testified that his first observation of the white pickup truck's erratic driving occurred prior to the start of the dashcam recording (Doc. # 63-6, at 63, 117) and that otherwise the inclement, nighttime weather conditions obscured the range and clarity of the dashcam video.  (*See* Doc. # 63-6, at 63–64, 88–89 (testifying that the "field of vision" on the dashcam is "blurry from all the rain"); Doc. # 63-6, at 63-64 (testifying that on the dashcam it is "difficult to see" Mr. Ruda's truck "swerve" because of the rain); Doc. # 63-6, at 125 (testifying that the video is "too fuzzy" to capture Mr. Ruda's truck hit the curb on the right side of Highway 80); Doc. # 63-

6, at 145 (testifying that the video is "too blurry" because of the rain); Doc. # 63-6, at 147 (testifying that, although he saw Mr. Ruda's truck "nearly strik[e] several vehicles" when it came to a stop at a traffic light on Highway 280, this is "not visible "on the dashcam video)).

On one hand, a jury could credit Officer Boisvert's testimony.  A jury could find that his testimony supplements the dashcam video and that Mr. Ruda's allegedly erratic driving is obscured on the video due to the rain, the darkness, and the glare created by the patrol car's blue lights, the streetlights, and the headlights from oncoming vehicles.  On this record, Officer Boisvert's story about what occurred  is not "'blatantly contradicted'" by the dashcam video so as to require its rejection. *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (quoting *Harris v. Scott*, 550 U.S. 372, 380 (2007)).  To borrow from *Cantu*,

> [T]here are ambiguities and lack of clarity about some of the details, including important ones which, when considered against the account [Officer Boisvert] gave in h[is] deposition, present material factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

2020 WL 5270645, at *6 (cleaned up).

On the other hand, a reasonable jury could reject Officer Boisvert's story.  A reasonable jury could view the dashcam video in light of Officer Boisvert's testimony and find it unbelievable that little to none of what Officer Boisvert says he saw is visible through the lens of the dashcam.  Moreover, a reasonable jury could

credit Mr. Ruda's testimony over Officer Boisvert's: that he did not violate any laws or "do anything wrong" (Doc. # 59-1, at 153, 163) and that, as soon as he realized the patrol car was behind him, he pulled off immediately into the Glory Days parking lot. (Doc. # 59-1, at 163; Doc. # 55-19, at 1.)

Assuming *arguendo* that arguable reasonable suspicion existed for a DUI traffic stop and to be thorough, the court will address the issue of whether there was probable cause or arguable probable cause to arrest Mr. Ruda for DUI. There is no talismanic test for assessing when a lawful stop turns into an arrest. "[T]he totality of circumstances determines when an encounter has become too intrusive to be classified as a seizure and has become an arrest, requiring probable cause." *Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991).

The parties agree that Mr. Ruda was arrested; however, they disagree as to the timing of the arrest. Mr. Ruda argues, without citation to authority, that the stop escalated to an arrest without probable cause when Officer Boisvert brandished his weapon as he approached Mr. Ruda. However, the Eleventh Circuit has "said many times before that 'the fact that police . . . draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest.'" *Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 854 (11th Cir. 2013) (quoting *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995)); *see also United States v. Gibbs*, 917 F.3d 1289, 1297 (11th Cir. 2019) ("We have repeatedly held that the mere fact that an officer

drew his weapon does not transform an otherwise lawful stop into an unlawful detention.") (citations omitted); *Jackson*, 206 F.3d at 1166 (holding that a Terry stop occurred when "the three police officers, with guns pointed, ordered with profanity that Plaintiffs lie on the floor"); *United States v. Roper*, 702 F.2d 984, 987 (11th Cir. 1983) ("[A]n officer's display of weapons does not necessarily convert an investigatory stop into an arrest.").  Mr. Ruda has not demonstrated that this case falls outside the usual "matter of course."  *Clark*, 544 F. App'x at 854.

Officer Boisvert says that, after he holstered his weapon and grabbed Mr. Ruda's arm, he detected the odor of alcohol on Mr. Ruda's breath and, at that moment, Mr. Ruda was under arrest for DUI.  (Doc. # 63-6, at 251–53.)  Even if Officer Boisvert's timing of the arrest is accepted, he would not be entitled to qualified immunity at this stage.  First, the timing of his statement that he smelled alcohol on Mr. Ruda's breath raises a credibility issue for the jury.  Officer Boisvert's incident report, which he prepared on the day of Mr. Ruda's arrest, omits the significant fact that he smelled alcohol on Mr. Ruda's breath.  (Doc. # 55-45, Doc. # 63-6, at 111.)  It was not until his deposition, which took place some fifteen months after Mr. Ruda's arrest, that Officer Boisvert recalls the odor of alcohol on Mr. Ruda.

Second, as previously analyzed, all of Officer Boisvert's observations of Mr. Ruda's erratic driving, which can be neither squarely rejected nor accepted by the

dashcam video, present genuine disputes of material fact for trial, and Officer Boisvert has relied on these observations to corroborate his probable cause determination. Third and relatedly, while in this circuit the smell of alcohol on a driver supplies reasonable suspicion that the driver is driving under the influence of alcohol, additional corroboration is required to establish probable cause for a DUI arrest. *See Miller v. Harget*, 458 F.3d 1251, 1261 (11th Cir. 2006) ("[T]he smell of alcohol was sufficient to give Officer Harget reasonable suspicion that Mr. Miller had been driving under the influence of alcohol.  As Officer Harget engaged in a reasonable investigation, including requesting that Mr. Miller submit to a breathalyzer test, Mr. Miller refused to cooperate.  This refusal gave Officer Harget probable cause to arrest Mr. Miller.").  Hence, the smell of alcohol alone would not entitle Officer Boisvert to qualified immunity for a DUI arrest.

Fourth, even if it is assumed that Mr. Ruda's driving behavior, as reported by Officer Boisvert, justified the traffic stop under suspicion that Mr. Ruda might be driving under the influence, Officer Boisvert did not conduct a reasonable investigation of his suspicion.  His investigation for a possible DUI was non-existent.  He did not attempt to ask Mr. Ruda a single question to discern whether Mr. Ruda was unlawfully inebriated while driving.  He did not ask for his license or registration.  He did not conduct a field sobriety test or invite Mr. Ruda to take a breathalyzer test.  Rather, with his weapon drawn, he charged toward a suspect who

was standing by his vehicle with his hands raised and palms open and wrestled him to the ground.

In sum, based on the evidence, construed in the light most favorable to Mr. Ruda, no reasonable police officer could have believed that there was arguable probable cause to arrest Mr. Ruda for DUI based only on Officer Boisvert's whiff of alcohol on Mr. Ruda's breath. Qualified immunity cannot be resolved at the summary judgment stage.

Based on the material factual disputes, Mr. Ruda also is not entitled to summary judgment on the Fourth Amendment unlawful arrest claim against Officer Boisvert.

### b. Officers Bettencourt and Geiger

Officers Bettencourt and Geiger, though, are entitled to qualified immunity on the Fourth Amendment unlawful arrest claim.  They did not participate in the events leading up to the allegedly unlawful arrest of Mr. Ruda, and, on the facts of this case, Mr. Ruda cites no clearly established law that would give Officers Bettencourt and Geiger "fair warning" that they could be held liable for assisting Officer Boisvert with the arrest. *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) (citation and internal quotation marks omitted).

Reasonable suspicion and probable cause are assessed based on the collective knowledge of the officers involved and the totality of the circumstances, and that

knowledge does not have to be firsthand.  *See United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004) (reasonable suspicion was based on a totality of the circumstances from the collective knowledge of the officers involved in the stop); *United States v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016) (Probable cause is based on the "facts and circumstances within the collective knowledge of the law enforcement officials.") (citation and internal quotation marks omitted); *Hartsfield v. Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995), *as amended* (June 14, 1995) (denying qualified immunity to a deputy sheriff because he failed to take reasonable steps to identify the proper residence for a search, but granting the assisting deputies qualified immunity because "nothing in the record indicate[d] that these officers acted unreasonably in following [the deputy sheriff's] lead, or that they knew or should have known that their conduct might result in a violation of the [plaintiffs'] Fourth Amendment rights").  Furthermore, "[t]he fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers."  *Windsor v. Eaves*, 614 F. App'x 406, 410 (11th Cir. 2015) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012)).

Officers Bettencourt and Geiger responded as backup for Officer Boisvert and arrived on the scene at Glory Days as Officer Boisvert, with his weapon drawn, was walking toward Mr. Ruda.  Under the circumstances of this case, Officers Bettencourt and Geiger could reasonably rely on the police radio transmissions that

27

Officer Boisvert was pursuing and closing in on a DUI suspect and reasonably could have believed that there was probable cause to arrest Mr. Ruda for DUI. (Doc. # 63-3, at 40.) Officer Bettencourt and Geiger did not have the benefit of time for a debriefing from Officer Boisvert. They had to react on what information they knew at the time and what they saw at the scene. Because reasonable officers arriving at Glory Days as backup officers could have believed that there was probable cause to arrest Mr. Ruda for DUI, Officer Bettencourt and Geiger are entitled to qualified immunity on Mr. Ruda's unlawful arrest claim. *See Duran v. Sirgedas*, 240 F. App'x 104, 116 (7th Cir. 2007) (holding that the officer who was not present at the scene when the initial dispute began but arrived in response to a call for backup was entitled to qualified immunity for false arrest; "a reasonable officer witnessing the scene and seeing other officers move to arrest Gonzalo could believe that those officers were acting on probable cause, and assist in effectuating the arrest," even if "the other officers may not have expressly told Officer Peslak that probable cause existed . . . ."); *Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997) ("[T]he actions of a police officer acting in reliance on what proves to be the flawed conclusions of a fellow police officer may be reasonable nonetheless and thus protected by the doctrine of qualified immunity."); *Phelps v. City of New York*, No. 04 CIV. 8570 (DLC), 2006 WL 1749528, at *3 (S.D.N.Y. June 27, 2006) (responding officer was entitled to summary judgment for false arrest claims; "police officers called upon to

28

aid other officers in making an arrest are entitled to assume that the officers requesting aid have acted properly"). Mr. Ruda has not pointed to any clearly established law that would strip Officers Bettencourt and Geiger of qualified immunity on the Fourth Amendment false arrest claim.

In sum, Officers Bettencourt and Geiger are entitled to qualified immunity on the unlawful arrest claim because not every reasonable officer on the scene would have believed that a constitutional violation had occurred—*i.e.*, an unlawful arrest. Therefore, they would not have known that it was unlawful to assist Officer Boisvert in effectuating the arrest. Accordingly, Defendants' motion for summary judgment on the Fourth Amendment unlawful arrest claim against Officers Bettencourt and Geiger on qualified immunity grounds is due to be granted.

### 3.   *Excessive Force in Effectuating an Arrest*

#### a.   **General Principles**

In the Eleventh Circuit, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Alston*, 954 F.3d at 1319–20 (citing *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1331 (11th Cir. 2006)). Hence, Mr. Ruda cannot "support an excessive force claim on the theory that any force is excessive if the underlying arrest was illegitimate." *Id.* He is correct, though, that if the jury finds his arrest is unconstitutional and if qualified immunity is averted, "the damages recoverable on

[his] unlawful arrest claim [against Officer Boisvert] include damages suffered because of the use of force in effecting the arrest." *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1332 (11th Cir. 2006) (citation and internal quotation marks omitted) (alterations added); (Doc. # 57, at 72–73.)

Mr. Ruda does not predicate his Fourth Amendment excessive force claim "solely on allegations [that] the arresting officer lacked the power to make an arrest." *Bashir*, 445 F.3d at 1331 (citation omitted). He also contends that, even if his arrest is found to be lawful, the amount of force used to effectuate the arrest was unlawful. (Doc. # 57, at 53.) This claim "relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). The court, thus, turns to this discrete claim of excessive force against Officers Boisvert, Bettencourt, and Geiger.

### b. Officers Boisvert, Bettencourt, and Geiger

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*

In *Hadley*, the Eleventh Circuit delineated the following factors as "instructive in determining whether an officer's use of force was objectively reasonable, including (1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." 526 F.3d at 1329. Additional factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Lee*, 284 F.3d at 1197 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Furthermore, because the Fourth Amendment's excessive force standard "established no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [defendant's] position to conclude the force was unlawful." *Post v. Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *modified on other grounds*, 14 F.3d 583 (11th Cir. 1994). In the Eleventh Circuit, it is clearly established that the "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330.

It is undisputed that, during the seventy-two second scrum to handcuff Mr. Ruda, all three officers used force against him. Officer Boisvert employed "hard and soft hand techniques," including "hard palm strikes," against Mr. Ruda. (Doc. # 55, at 3.) Officer Geiger struck Mr. Ruda with his fists. (Doc. # 63-3, at 62.)

31

Officer Bettencourt deployed his taser twice on Mr. Ruda when he was "lying down in the parking lot, face down."  (Doc. # 63-2, at 166); (*see also* Doc. # 63-2, at 167–68 (testifying that "I took out my taser, I took the cartridge off of the taser, and I drive stunned him in his . . . upper back area" in order to "get to his hands" and to "immobilize those muscles" in the back and that, with the second drive stun, we "were able to get his arm").)  Officer Bettencourt also "knee struck" Mr. Ruda once and possibly twice.  (Doc. # 63-2, at 103–04.)

Whether this level of force, which resulted in abrasions to Mr. Ruda's face, chest, and stomach and in a broken elbow, was excessive again depends upon whether Mr. Ruda's or Defendants' version of events is credited.

According to the officers, they were involved in a dangerous, rapidly escalating encounter, with a resistant arrestee whom they believed to be armed and under the influence of alcohol or another substance.  Officer Boisvert claims that Mr. Ruda resisted:  Mr. Ruda grabbed him in the groin, tried to pull Officer Bettencourt's "legs out from under him," and refused to put his hands behind his back.  (Doc. # 63-6, at 234–35; Doc. # 55-3.)   Officer Bettencourt believed Mr. Ruda was armed because Mr. Ruda jumped out of his truck "without being told to do so," he did not comply with the commands to get on the ground, and, during the scrum, he kept reaching his hands "toward his waistband."  (Doc. # 63-2, at 119–20.)   Officer Bettencourt also suspected that Mr. Ruda was under the influence of

alcohol because "[h]is body odor was offensive with an alcoholic beverage, he was slurring his speech . . . , and he was unsteady on his feet." (Doc. # 63-2, at 198.) Additionally, Officer Bettencourt opined that Mr. Ruda had "unusual strength," and, in his experience, "people who are usually unnecessarily strong are under the influence of some narcotic." (Doc. # 63-2, at 128.) Officer Geiger shared Officer Bettencourt's concerns that Mr. Ruda was armed. (*See, e.g.*, Doc. # 63-71–72 (testifying that he was concerned that Mr. Ruda was armed because he was reaching "towards his waistline").) In sum, the officers contend that the application of force was necessary because Mr. Ruda continuously failed to comply with their commands and violently resisted the officers' attempts to handcuff him.

Mr. Ruda offers a different picture. He attests that he offered no resistance and that he never struck any of the officers. He contends that all of his "movements and actions were all taken in an attempt to ward off their blows and assaults" and to avoid being cut by the sharp gravel in the parking lot. (Doc. # 57, at 21.) Mr. Ruda also emphasizes that, because the blaring sirens drowned out Officer Boisvert's commands, he immediately raised his hands over his head to show his submission. He resisted initially being forced on the ground but only because he feared getting cut from the sharp gravel in the parking lot. (Doc. # 55-19.)

On this record, the pertinent factors for measuring whether the use of force was objectively reasonable weigh clearly in Mr. Ruda's favor. First, although DUI

is a serious crime, there are significant factual disputes as to whether there were grounds to stop and arrest Mr. Ruda for DUI.  In other words, probable cause for the arrest, at this stage, could be viewed as suspicious.  Second, with all three officers bent down and on top of Mr. Ruda, and with Mr. Ruda's body largely obscured, it is difficult to make out on the dashcam video whether Mr. Ruda was a resistant suspect refusing to surrender his hands or whether the officers' blows and tasing were inflicted "maliciously and sadistically" on an unresisting suspect.  *Hadley*, 526 F.3d at 1329.  Furthermore, on the question of resistance, the dashcam video also raises issues of whether a reasonable officer would have considered whether Mr. Ruda could even hear his initial commands over the multiple blaring sirens and whether Officers Bettencourt and Geiger actually interfered with what Officer Boisvert was trying to accomplish—getting Mr. Ruda face down on the ground.  Third, Mr. Ruda's injuries were more than superficial; among other significant injuries, his elbow was broken.  Fourth, as to whether Mr. Ruda was an immediate threat, the officers outnumbered Mr. Ruda three to one; Mr. Ruda was fully visible outside his truck with raised empty hands (after which Officer Boisvert felt safe enough to holster his firearm); and Mr. Ruda in fact was unarmed.

In short, the disputed material facts and the opposing but reasonable inferences that can be derived from the evidence readily reveal that this is a classic case requiring jury resolution of the factual disputes undergirding the excessive force

claim.  Accordingly, the cross-motions on summary judgment will be denied on the excessive force claim and the defense of qualified immunity.

## B.   <u>State law Claims:  State-Agent Immunity</u>

Mr. Ruda does not move for summary judgment on his state law claims. Defendants, though, move for summary judgment on grounds that State-agent immunity defeats Mr. Ruda's state law claims against them in "Counts III, IV, and V of Plaintiff's First Amended Complaint" (Doc. # 61, at 29), which encompass claims for false imprisonment, false arrest, unlawful restraint of freedom, assault and battery, and malicious prosecution.  (Doc. # 50, at ¶¶ 31–38.)

The Alabama Supreme Court "has established a burden-shifting process when a party raises the defense of State-agent immunity."  *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006) (citation and internal quotation marks omitted).  "In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity."  *Id.* (citations omitted).  In this case, if Defendants "make[] such a showing, the burden then shifts to [Mr. Ruda] to show that [Defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority."  *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008) (citation and internal quotation marks omitted).  "One of the ways in which a plaintiff can show that a State agent acted beyond his or her authority is by proffering evidence that the State agent failed

35

to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Id.* at 1282–83 (citation and internal quotation marks omitted).

Defendants have met their burden of showing that "they were engaged in law-enforcement functions" for which State-agent immunity applies. *Id.* at 1283. First, the parties have stipulated that, "[o]n the night of March 29, 2018 and during the morning hours of March 30, 2018 Defendants Boisvert, Bettencourt and Geiger, all of whom were Phenix City police officers, were acting in the line and scope of their duties as police officers and under color of state law in regard to their arrest of Plaintiff Ruda." (Doc. # 91 (Stipulated Facts).)  Second, prior to entering into this stipulation, Defendants argued, and Mr. Ruda did not counter their argument (*see* Doc. # 65), that "Boisvert, Bettencourt, and Geiger were police officers whose duties included the enforcement of criminal laws" and that "the conduct made the basis of Plaintiff's claims against them are based on their exercise of judgment in pursuing and[/]or arresting Ruda." (Doc. # 61, at 30.)  The evidence supports Defendants' uncontested argument.  Namely, as already discussed, Officer Boisvert pursued and arrested Mr. Ruda in order to enforce the criminal DUI laws of the state of Alabama, and Officers Bettencourt and Geiger, in assisting with completing the arrest, also were within "the line and scope of their law-enforcement duties." *Ex parte Kennedy*, 992 So. 2d at 1283; *see also Downing v. City of Dothan*, 59 So. 3d 16, 20 (Ala. 2010) (finding "no question" that defendant municipality's "police officers were exercising

36

a discretionary function in deciding whether to arrest Farmer for driving under the influence").

Based on the stipulations and evidence, the burden shifts to Mr. Ruda to show that each Defendant "acted willfully, maliciously, fraudulently, in bad faith, or beyond his . . . authority." *Ex parte Kennedy*, 992 So. 2d at 1282 (internal quotation marks and citation omitted). Mr. Ruda has failed to sustain his burden. In his brief filed in opposition to Defendants' motion for summary judgment (Doc. # 65), Mr. Ruda focuses solely on Counts I and II, which are the § 1983 Fourth Amendment claims. His brief is silent regarding the State-agent immunity issues. Mr. Ruda does not address State-agent immunity or his burden to defeat it as to each officer and each claim. There are three officers and five state law claims embedded in three counts. Each officer's conduct requires separate examination for each of the five state law claims. Yet, Mr. Ruda's brief does not set forth what is required to prove each claim,[9] include any analysis of State-agent immunity, or point to what evidence Mr. Ruda contends defeats each officer's entitlement to State-agent immunity as to each claim. For these reasons, Defendants are entitled to summary judgment on the state law claims, and these claims are due to be dismissed.

---

[9] Mr. Ruda's jury instructions also do not include proposed charges for each state law claim (*see* Doc. # 96), and Mr. Ruda's contentions in the pretrial order merely reference "state law claims," without elaboration (*see* Doc. # 85, at 3–4).

## V.  CONCLUSION

Based on the foregoing, it is ORDERED that Defendants' motion for summary judgment (Doc. # 58) is GRANTED in part and DENIED in part as follows:

(1)    GRANTED on the basis of qualified immunity on Plaintiff's § 1983 claims that Officers Bettencourt and Geiger violated his Fourth Amendment rights prohibiting an unlawful arrest;

(2)    DENIED on Plaintiff's § 1983 claim that Officer Boisvert violated his Fourth Amendment rights prohibiting an unlawful arrest;

(3)    DENIED on Plaintiff's § 1983 claims that Officers Boisvert, Bettencourt, and Geiger violated his Fourth Amendment rights prohibiting excessive force during the course of an arrest; and

(4)    GRANTED on the basis of State-agent immunity on all state law claims.

It is further ORDERED that Plaintiff's motion for partial summary judgment (Doc. # 54) is DENIED.

DONE this 13th day of October, 2020.

_____
/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE